**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

MINSOO SOHN,

*Plaintiff*,

v.

KOMINOX USA, INC. AND YOONKON YANG,

*Defendants*.

Civil No.: 21-cv-17526 (KSH) (SDA)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**Katharine S. Hayden**

## I. Introduction

In a four-count amended complaint (D.E. 2), plaintiff Minsoo Sohn alleges violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*., the New Jersey Wage and Hour Law ("NJWHL"), N.J.S.A. 34:11-56a *et seq.*, and the New Jersey Wage Payment Law ("NJWPL"), N.J.S.A. 34:11-4.1 *et seq.*, by defendants Kominox USA, Inc. and its principal, Yoonkon Yang. Specifically, Sohn alleges that during the four years that he was an employee of Kominox USA, Yang forced him to work upwards of 105 hours per week for sub-minimum-wage payment and without compensation for overtime, in violation of both the federal and state statutes.

The Court held a bench trial and now sets forth its findings of fact and conclusions of law, pursuant to Fed. R. Civ. P. 52(a).

## II. Procedural History

Sohn filed suit on September 24, 2021, naming Kominox USA and a person named Joon Ho Kim as defendants. (D.E. 1.) He filed the operative First Amended Complaint ("FAC") on the same day, substituting Yang in the place of Kim. (D.E. 2.) Joon Ho Kim appears nowhere else in the present record.

The FAC alleges that defendants failed to pay minimum wage (Counts One and Three) and overtime (Counts Two and Four) in violation of FLSA and the comparable New Jersey statutes.

During motion practice, then-Magistrate Judge Kiel denied on jurisdictional grounds Yang's motion for leave to file counterclaims for breach of contract and unjust enrichment. (D.E. 29.) Yang claimed that he made a series of outstanding personal loans to Sohn totaling $42,501. (D.E. 22.) Yang subsequently filed those claims in Bergen County Superior Court (Docket No. BER-L-4185-22). (D.E. 112, 113.) After a bench trial, the Honorable Lina P. Corriston, J.S.C., dismissed the suit, concluding in an oral opinion that Yang had "not sustained his burden of proving that he conferred any benefit" on Sohn, but rather that Yang "issued these checks for his own benefit and used [Sohn] to execute his plan to cover his financial transactions" regarding an extra-marital girlfriend and expensive visits to cocktail bars and lounges. (D.E. 113 19:1–9.)

This Court held a bench trial as to the FAC on May 11 and June 4, 2026. (D.E. 149, "1T"; D.E. 150, "2T.") Sohn testified on his own behalf and called no other witnesses. (1T 19:9–121:10.) Yang was likewise the defense's only witness. (1T 122:4–134:13; 2T 139:12–214:1.)

After trial, at the direction of the Court, both parties submitted proposed findings of fact and conclusions of law. (D.E. 145 (plaintiff), "Pl. PFF"; D.E. 148 (defendants), "Def. PFF.")

## III. Facts

### A. Agreed Facts

The Court finds the following facts, on which the parties generally agree.

Kominox USA operated from a small office in Englewood Cliffs and managed patent-related matters concerning cancer medications for a Korean company owned by Yang's father; after the relevant patent-development work was largely completed, the company's remaining role was to maintain and manage research materials. (D.E. 112, state trial transcript, 69:3–16; 1T 23:22–25; 2T 170:13–16, 172:15–173:5.) Sohn worked for Kominox USA from the early summer of 2017 through the late summer of 2021. (1T 20:10–12, 93:20–25; 2T 167:11–18.) Other than Sohn, Yang was the company's only active employee, although his wife was on the payroll for insurance purposes. (*Id.* at 171:2–7.) Sohn was an at-will employee. (2T 167:24–168:4.) His responsibilities included basic office tasks such as organizing documents, scanning, receiving and organizing mail, file management, attending to office bills, and checking on patents. (1T 27:5–7; 2T 171:19–22, 173:8–18, 213:14–22.)

Kominox USA did not have a time clock, any other device, or a formal system to track Sohn's hours. (1T 31:21–32:13; 2T 169:15–19.)

Sohn received fixed payments from Kominox USA. His compensation was $1,000 twice a month until 2018, when that rate increased to $1,250 (1T 29:2–30:21; Def. PFF at 4). Yang also made regular payments to Sohn in the amount of $500 monthly in additional compensation (1T 29:14–20; 2T 142:4–13) and $300 for vehicle expenses (1T 90:11–25; 2T 186:2–4, 201:3–5). At trial, defendants submitted a large collection of W-2s, payroll reports prepared by a CPA,

and similar records that show Kominox USA's regular payments to Sohn; the parties concur that the documents show the total amount paid to Sohn without a tally of hours worked. (1T 9:5–13:18.)

Kominox USA never paid Sohn overtime wages. (2T 212:10–15.)

### B. The Parties' Factual Contentions

#### a. Sohn's Testimony

The parties diverge sharply on many facts, particularly on how long Sohn spent in the office and the nature and extent of his work for Yang outside of the office. Sohn argues that all the work he performed—whether in the office, at Yang's home, helping Yang's family, on business trips, etc.—constitutes compensable employment for which Kominox USA did not fully pay him.

Sohn insisted that his work at Yang's behest over the years he worked for Kominox USA averaged 95 to 100 hours per week in the first month, increasing to as much as 105 hours thereafter and throughout his employment. (1T 50:16–21, 83:1–9.) He testified that this grueling schedule began with a "mental test" probationary period, during which Yang required him to be at the office from approximately 8:00 a.m. until 7:00 p.m., return at 8:30 p.m., accompany Yang to drinking establishments until approximately 2:30 a.m., and then report back to the office at 8:00 a.m. the next morning. (*Id.* 31:3–34:5.) Sohn said that he was generally able to sleep only four hours per night throughout his employment and that he had little time to spend with his child, born in April 2018; he said he was only able to "see her face while she is sleeping very early in the morning." (*Id.* 73:17–74:15.) He suggested that Yang required him to work a seven-day workweek because he lacked a college degree. (1T 53:6–17.)

Sohn testified that after the first month, he would work from approximately 9:00 a.m. to 7:30 p.m., go home for dinner, return to the office by approximately 9:00 p.m., and remain there until midnight, usually translating research documents. (*Id.* 50:22–52:2.) Sohn added that a corollary purpose of his late-night time at the office was to wait for Yang, who was spending time with a woman that Sohn characterized as Yang's girlfriend; Sohn said Yang would eventually return to the office and require Sohn to accompany him to bars and lounges until 2:30 a.m. (*Id.* 40:8–12, 51:22–52:19.) These late-night requirements typically happened four nights a week, according to Sohn. (*Id.* 52:4–6.) He testified that he was often responsible for driving Yang home after a late night of drinking, which sometimes, when Yang went out alone, meant Sohn had to make special trips to pick him up and bring him home. (*Id.* 34:19–23, 45:5–46:5.)

Sohn also testified to extensive responsibilities in support of Yang's family. He said he drove Yang's children to dental and medical appointments and Yang's wife to the grocery store. (*Id.* 39:9–10, 69:24–70:19.) He said these shopping responsibilities also included trips to Costco to purchase and transport cases of bottled water, primarily for Yang's girlfriend. (*Id.* 64:19–67:16.) Sohn testified that he was also expected to help prepare meals at Yang's girlfriend's house and to clean the dishes afterward. (*Id.* 44:18–21.) When those meals were Sunday barbecues at Yang's house, Sohn said he had to prepare a wood fire from logs he made from trees on Yang's property and barbecue meat to Yang's liking. (*Id.* 67:21–68:17, 112:14–22.) He added that he cared for Yang's family dogs and generally oversaw his house during those times that Yang and his family traveled to Korea. (*Id.* 84:20–86:4.)

Sohn testified that his work for Yang's personal interests extended to renovations at Yang's home. He said it was his responsibility to obtain estimates from contractors, but when Yang decided to take on the renovation himself, Sohn was required to contribute to the work, as

was his brother. (*Id.* 61:1–13, 97:7–16.) Sohn testified that he removed and replaced flooring, assisted his brother and Yang with bathroom work, cabinets, and bedrooms, and performed demolition work as part of the renovation. (*Id.* 54:6–55:11, 98:14–100:9.) He testified that this renovation work included trips to purchase materials. (*Id.* 98:23–99:4.) As support, Sohn submitted ten photographs depicting renovation work at Yang's home. (*Id.* 55:13–59:5.) Neither Sohn nor anybody else appears in them; Sohn testified that he had taken them discreetly and quickly to show to his wife as an explanation for his whereabouts. (*Id.* 56:8–19, 59:2–60:21, 113:7–114:20.) Sohn testified that at times during the construction work, Yang hit him, at one point repeatedly striking his forehead until he answered a question correctly. (*Id.* 83:16–84:18.)

But Sohn's claims about his responsibilities for Yang's home go beyond renovation work. He testified that he regularly performed yard work, including pulling weeds, trimming bushes, cleaning debris, and clearing dead trees. (*Id.* 38:22–39:25, 70:22–71:13, 109:12–111:24.) He added that he regularly raked leaves and cleared snow. (*Id.* 71:3–14, 106:19–107:13, 110:6–14.) Sohn said he was also responsible for picking up Yang's cigarette butts around the property. (*Id.* 39:6–8, 109:12–17.)

He also testified that he had to perform tasks for the benefit of Yang's girlfriend, driving her around for school—both to English-as-a-second-language classes and university courses—and shopping. (*Id.* 64:19–67:16, 104:10–105:21.) He testified that he helped her with academic work, including interpreting during online classes and explaining course materials. (*Id.* 69:6–23, 102:19–105:21.) Sohn said that while she was taking online classes during the pandemic, he sat with or near her on Mondays, Wednesdays, and Fridays from approximately 9:00 a.m. to 12:30 p.m. and again from approximately 5:00 p.m. to 7:30 p.m. (*Id.*) He said he went so far as to use his phone to find answers for the college tests she took remotely. (*Id.* 103:20–22.) Sohn testified

that when he drove her to classes, he would wait in the car until it was time to drive her home; he said he also helped her obtain identification, books, and other school materials. (*Id.* 104:10–105:21.)

Finally, Sohn testified that he took various trips with Yang that were uncompensated business activities. According to Sohn, he went on business-related travel to Washington, D.C., Los Angeles, and the Cayman Islands. (*Id.* 75:6–77:20.) He described a trip that he took with Yang's family to Florida, asserting that while they vacationed, he served as their driver, arranged reservations, and handled food pickup, among other responsibilities, all while sleeping on a couch rather than in a room of his own. (*Id.* 79:12–80:20.)

Sohn claims that none of the office, after-hours, personal-service, household, driving, renovation, or travel work was separately compensated with overtime pay. (Pl. PFF at 1.)

Sohn testified that in four years of employment, he took off only 10–15 full days. (1T 82:17–22, 94:12–14.)

Sohn calculates his damages for the combination of unpaid overtime and statutory damages at $1,088,386.50 and requests pre- and post-judgment interest and reasonable attorney's fees and costs. (Pl. PFF at 27–28.) He makes this damages calculation by first crediting his own testimony that he worked upwards of 100 hours per week for the first month (thus, 60 overtime hours) and 105 hours per week (meaning 65 overtime hours) thereafter, and then determining from the undisputed amounts that Kominox USA paid him that his weekly rates were $623.07 in the first month followed by a raise to $692.30 for the remainder of his employment. (*Id*. at 24–25.) By that formula, Sohn's unpaid overtime wages total $362,795.50. (*Id.* at 26.) Sohn then doubles that amount to arrive at $725,591.00 in liquidated damages under FLSA and NJWHL, *see* 29 U.S.C. § 216(b) and N.J.S.A. § 34:11-56a25, adds those numbers together, and arrives at

"a total wage-and-liquidated damages award of $1,088,386.50, exclusive of post-judgment interest, reasonable attorneys' fees, costs, and pre[-]judgment interest to the extent permitted by law and not duplicative of liquidated damages." (*Id.* at 27–28.)

**b. Yang's Testimony**

In general, Yang's position is that Sohn's claimed hours are inflated and that much of the alleged non-office activity was social, voluntary, or constituted make-up work for times when Sohn could not satisfy 40 hours of work in a week.

According to Yang, Kominox USA had little work to do and Sohn could not fill 40 hours a week with office-based tasks. (2T 172:13–173:5, 180:1–8, 185:8–20.) He testified that Sohn performed "very basic stuff" like organizing documents, managing emails, paying bills, the "very simple task" of checking quarterly vendor-supplied patent lists against previous versions, and scanning paperwork. (*Id.* 171:19–172:7, 173:10–13, 178:15–179:24, 213:19–22.) According to Yang, he "did not need to hire anyone" (*id.* 180:8) but brought Sohn on board because he "tried to help him out that he could become a U.S. citizen" (*id.* 173:9–10). "I did not really have to hire him in the first place, but I was hiring him or using him to help him out," said Yang, "because he had an issue with the immigration, specifically with the U.S. citizenship issue." (*Id.* 141:11–14.) Yang added that part of his motivation in hiring Sohn was to provide him and his wife with health insurance, particularly because Sohn's wife was pregnant. (*Id.* 142:10–143:10.)

Yang testified that Sohn taught golf lessons and delivered food for DoorDash in addition to his work at Kominox USA. (*Id.* 208:7–209:9.) Still, Yang maintained that Kominox USA paid Sohn for a 40-hour workweek and paid the entire amount for Sohn's family's health

insurance. (*Id.* 141:8–16, 142:21–143:10, 182:7–12.) Yang repeatedly denied that Sohn ever worked overtime. (*Id.* 150:5–9, 153:10–21.)

Yang testified that he understood Sohn's wages to represent 40 hours' worth of work. (*Id.* 141:5–16, 182:7–12.) He said Sohn would send him text messages through a Korean messaging app reporting the times at which he arrived and left work (those messages are not in evidence). (*Id.* 185:13–20, 210:15–211:12.) Yang calculated from the messages that Sohn averaged 29.34 hours of work per week. (*Id.* 181:6–19.)[1] He testified he believed the American system required him to pay any employee for 40 hours each week, and he did. (*Id.* 141:14–16.) Yang said his hours calculation includes time during regular office hours, additional time that Sohn spent doing office work on the weekends, and at least some tasks that Sohn completed outside of the office unrelated to the business of Kominox USA, such as aiding Yang's family. (*Id.* 181:14–16, 183:24–184:10, 196:13–20, 211:14–212:15.) He explained that he did not pay Sohn separately for daytime errands because they occurred during his working hours and Sohn did not otherwise complete a 40-hour workweek. (*Id.* 153:4–9.)

Yang testified that Sohn's initial work schedule was set at 9:00 a.m. to 6:00 p.m. Monday through Friday, but that the schedule became flexible because Sohn would leave the office to spend time working toward licensure in real estate and golf instruction. (*Id.* 196:21–197:21.) Yang said he also tracked when Sohn left the office for personal matters like doctor appointments, court, the bank, or car repairs, and factored that non-work time into his 29.34-hour-per-week calculation. (*Id.* 181:6–16, 185:13–20, 210:11–211:12.) Yang acknowledged

[1] Because this number arises from an estimate based on documents not in evidence, the Court does not rely on Yang's representation of Sohn's hours. Estimating hours worked "violates section 11(c) of the FLSA, 29 U.S.C. § 211(c), which requires employers to maintain accurate records to ensure that all workers are paid the minimum wage for every hour worked." *Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 128 (3d Cir. 1984). As discussed below, the Court presumes that no accurate records of Sohn's hours exist and proceeds under the legal framework the Supreme Court has established for such a situation.

that Sohn occasionally did office work on weekends but testified that it was only to make up for missed weekday time. (*Id.* 183:21–184:10.)

Yang also acknowledged that he would ask Sohn to run errands during office hours or to home-supply stores, that Sohn on occasion drove Yang's wife and children to various places, and that Sohn would sometimes drive Yang's girlfriend to school. (*Id.* 152:2–20, 168:8–169:2, 174:3–20, 182:20–23, 196:13–16.) But he said that he included most of this activity in his calculations of Sohn's work hours. (*Id.* 153:4–9, 182:20–23, 187:9–13, 188:10–16, 196:17–20.)

Yang added that several of what Sohn described as work-related tasks were social in nature. These included Costco trips, meals at Yang's home, and nights out drinking. (*Id.* 153:22–154:20, 165:15–20, 207:11–208:14.) Yang estimated that Sohn drove him home from a night out drinking approximately 10–15 times over the course of four years and said that he considered this compensable time if Sohn had not been socializing along with him. (*Id.* 203:24–204:11, 206:13–207:10.)

Yang denied that Sohn performed extensive renovation work on his home, testifying instead that he hired contractors and that the photographs admitted into evidence did not depict work that Sohn did. (*Id.* 187:14–21, 194:24–196:6.) He acknowledged that Sohn may have helped for a few hours or gone to the store to pick up supplies but suggested that such time factored into his 29.34-hour estimate. (*Id.* 184:16–18, 187:9–13, 196:13–20.) Yang rejected Sohn's claims that he did regular yard work, snow removal, or barbecuing. (*Id.* 157:8–158:14, 188:17–189:5, 190:18–191:21.)

According to Yang, the Florida trip was a vacation rather than work, and he brought Sohn on business trips he took to Los Angeles and the Cayman Islands at Sohn's request. (*Id.* 197:22–

198:9, 211:19–212:6, 212:21–213:5.) Yang said travel time was subject to Sohn's regular compensation and did not constitute overtime. (*Id.* 212:7–15.)

Ultimately, defendants attack Sohn's testimony regarding his 95–105-hour workweeks, limited sleep, alleged lack of time off, and claimed extra-office work as implausible and internally inconsistent. (Def. PFF at 14–17.)

## IV. Conclusions of Law

### A. Jurisdiction

This Court has original jurisdiction over Sohn's FLSA claim under 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Sohn's NJWHL and NJWPL claims pursuant to 28 U.S.C. § 1367(a) because those claims share a common nucleus of operative fact with the federal claims. *See Lyon v. Whisman*, 45 F.3d 758, 759–64 (3d Cir. 1995). FLSA, NJWPL, and NJWHL each authorize Sohn's private right of action. *See* 29 U.S.C. § 216(b); N.J.S.A. § 34:11-4.7; N.J.S.A. § 34:11-56a25; *see also Thompson v. Real Est. Mortg. Network, Inc.*, 106 F. Supp. 3d 486, 490 (D.N.J. 2015) (concluding that "the New Jersey Supreme Court would find an express right in the NJWHL to recover unpaid overtime compensation").

### B. Legal Standard

"Congress designed the FLSA to ensure that all covered employees receive a 'fair day's pay for a fair day's work' and receive protection from 'the evil of overwork as well as underpay.'" *Sec'y U.S. Dep't of Lab. v. Comprehensive Healthcare Mgmt. Servs.*, 177 F.4th 427, 432 (3d Cir. 2026) (quoting *Parker v. NutriSystem, Inc.*, 620 F.3d 274, 279 (3d Cir. 2010)). The statute requires employers to pay their employees a minimum hourly wage and one-and-a-half times the employees' regular rate for hours worked in excess of 40 hours per week. 29 U.S.C. §§

206(a), 207(a)(2). Certain categories of employees are exempt from FLSA's requirements, but none are relevant here. *See* 29 U.S.C. § 213. FLSA requires employers to maintain records of covered employees' wages and hours, including the hours worked each day and each workweek and the total wages paid each pay period. 29 U.S.C. § 211(c).

When, as here, an employee alleges underpayment pursuant to FLSA, and an employer has not produced "proper and accurate records," the employee "has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946); *Comprehensive Healthcare*, 177 F.4th at 437. If the employee produces evidence to show improperly compensated work and raises a reasonable inference of its extent, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Mt. Clemens*, 328 U.S. at 687–88. In the absence of such evidence from the employer, "the court may then award damages to the employee, even though the result be only approximate." *Id.* at 688.

The NJWHL "is designed to 'protect employees from unfair wages and excessive hours.'" *Hargrove v. Sleepy's, LLC*, 220 N.J. 289, 304 (2015) (quoting *In re Raymour & Flanigan Furniture*, 405 N.J. Super. 367, 376 (App. Div. 2009)). Like FLSA, the statute requires employers to pay employees a legally established minimum wage and time-and-a-half for overtime, subject to certain exceptions not applicable here. N.J.S.A. 34:11-56a4(a), (b)(1); *Lopez v. Marmic LLC*, 263 N.J. 225, 241 (2026), *cert. denied*, __ S. Ct. __, 2026 WL 2976227 (Oct. 5, 2026).

The NJWPL "'governs the time and mode of payment of wages due to employees.' Under the statute, employers must 'pay the full amount of wages due' an employee 'at least twice' each 'month, on regular paydays' fixed in advance." *Lopez*, 263 N.J. at 241 (quoting *Musker v. Suuchi, Inc.*, 260 N.J. 178, 186 (2025), N.J.S.A. 34:11-4.2).

The NJWHL and NJWPL are both "remedial and should be liberally construed." *Id.*

Like FLSA, both New Jersey statutes require employers to keep records of their employees' wages and hours. *Id.* at 236. "When employers fail to do so, a rebuttable presumption applies against them in wage claim cases." *Id.* (citing N.J.S.A. 34:11-58(d)).[2] This rebuttable presumption "is consistent with the standard articulated by the United States Supreme Court in *Mt. Clemens*." *Id.* at 250. According to the Supreme Court of New Jersey, "[u]nder *Mt. Clemens* . . . damages are 'certain'—and the burden shifts to the employer—when it is clear that money is owed in some amount." *Id.* at 251–52 (citing *Mt. Clemens*, 328 U.S. at 688).

The Court therefore understands the Supreme Court of New Jersey to set a plaintiff's burden under NJWHL and NJWPL as coextensive with *Mt. Clemens* and will proceed under that case's framework.

For a plaintiff to effectuate a burden shift, *Mt. Clemens* establishes a conjunctive test: an employee must (1) "prove[] that he has in fact performed work for which he was improperly compensated" and (2) "produce[] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." 328 U.S. at 687. In other words, the first prong requires establishing liability and the second damages. The *Mt. Clemens* inference belongs most properly to the second prong: only once an employee has established liability for improperly

[2] Although N.J.S.A. 34:11-58(d) establishes the rebuttable presumption in an administrative investigation of a wage claim and not in a private civil suit, the Supreme Court of New Jersey has extended the presumption to private civil suits by holding that a trial court erred by failing to apply the rebuttable presumption in an employee's favor in a private wage suit against an employer. *Lopez*, 263 N.J. at 250–52.

compensated work is the plaintiff entitled to show damages by way of evidence that raises a reasonable inference. *See Osborn v. JAB Mgmt. Servs., Inc.*, 126 F.4th 1250, 1256–57 (7th Cir. 2025) (quoting *Viet v. Le*, 951 F.3d 818, 822 (6th Cir. 2020)) ("The just and reasonable inference standard 'applies to damages questions only *after* an employee has met the initial burden to establish liability by showing that the employee performed uncompensated overtime work.' The standard does not apply to the employee's threshold burden of proving a violation of the FLSA. On that question— 'whether the plaintiff worked overtime at all'—the typical burden of proof applies."); *see also Carmody v. Kansas City Bd. of Police Comm'rs*, 713 F.3d 401, 406 (8th Cir. 2013) (citing *Mt. Clemens*, 328 U.S. at 688) ("[*Mt. Clemens*] only applies where the existence of damages is certain. [*Mt. Clemens*] allows uncertainty only for the amount of damages.").

Both prongs require an affirmative, substantiated showing: The employee must *prove* improperly compensated work and must *produce sufficient evidence* to raise a damages inference. A plaintiff's first task is therefore to prove by a preponderance of the evidence that he worked uncompensated overtime or was paid below minimum wage. *See E.M.D. Sales, Inc. v. Carrera*, 604 U.S. 45, 47 (2025) ("The usual standard of proof in civil litigation is preponderance of the evidence."); *see also Burch v. Reading Co.*, 240 F.2d 574, 578 (3d Cir. 1957) ("The classical statement of the burden of proof in an ordinary civil case . . . is that the facts must be proved by a 'preponderance of the evidence.'"), *cert. denied*, 353 U.S. 965 (1957). To do so, a plaintiff must provide substantiated evidence that "he has in fact performed work for which he was improperly compensated." *Mt. Clemens*, 328 U.S. at 687.

"Because the FLSA requires every employer to keep records of the 'wages, hours, and other conditions and practices' of its employees, 29 U.S.C. § 211(c), an employee easily discharges this burden by securing production of those records." *Rosano v. Twp. of Teaneck*,

754 F.3d 177, 188 (3d Cir. 2014) (citing *Mt. Clemens*, 328 U.S. at 687). However, when an "employer's failure to keep adequate records" creates "an evidentiary gap," employees may rely on "representative evidence" that need not be precise; such evidence includes, for example, employee testimony, representative documentary evidence, or estimates of work time provided by expert testimony. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 456, 450 (2016); *Sec'y of U.S. Dep't of Lab. v. Nursing Home Care Mgmt.*, 128 F.4th 146, 160–61 (3d Cir. 2025) (citing *Mt. Clemens* and *Bouaphakeo* for the proposition that representative evidence may be sufficient to carry a plaintiff's burden), *cert. denied*, 146 S. Ct. 99 (2025). Representative testimony

> has been accepted in cases where (1) there is substantial other evidence to support an inference drawn from representative testimony, (2) the employer has systematically caused records to be falsified that would otherwise be properly maintained, or (3) the [plaintiff] establishes a uniform pattern or practice of wage methods, conditions, and hours encompassing a class of employees.

*Reich v. Chez Robert, Inc.*, 821 F. Supp. 967, 984 (D.N.J. 1993), *vacated on other grounds*, 28 F.3d 401, 404 (3d Cir. 1994). No case establishes a definitive rule or test for precisely what representative evidence is acceptable or required. What is fundamental, rather, is that the plaintiff must make some showing to convince the factfinder that the limited proffered evidence is indeed representative of a larger set of facts.

When an employee attempts to raise an inference through representative testimony, "[t]he burden of any consequent imprecision [in an employee's calculation of damages] must be borne by th[e] employer" who failed to keep the records that FLSA requires. *Rosano*, 754 F.3d at 188 (quoting *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1297 (3d Cir. 1991)) (alterations in original).

Not "all inferences" that a court might draw from an employee's proffered evidence "are 'just and reasonable.'" *Bouaphakeo*, 577 U.S. at 459. For example, evidence "based on

implausible assumptions could not lead to a fair or accurate estimate of the uncompensated hours an employee has worked." *Id.* "Reasonable minds may differ as to whether" a plaintiff's evidence of alleged uncompensated time "is probative" of liability or damages; "[r]esolving that question, however, is the near-exclusive province of the [factfinder]." *Id.*; *U.S. ex rel. Int'l Bhd. of Elec. Workers Loc. Union 98 v. Farfield Co.*, 5 F.4th 315, 353 (3d Cir. 2021). As to liability, a factfinder "must at least be convinced that the evidence considered as a whole, its 'preponderance' to use the traditional term, indicates that the facts asserted by the plaintiff are probably true." *Burch*, 240 F.2d at 579. "Thus, a party proves a fact by a preponderance of the evidence when he proves that the fact's existence is more likely than not." *Greenwich Collieries v. Dir. of Workers' Comp. Programs*, 990 F.2d 730, 736 (3d Cir. 1993), *aff'd*, 512 U.S. 267, 281 (1994).

**C. Analysis**

Employee-friendly though the federal and state wage statutes certainly are, a liberal standard does not mean no standard at all. The absence of adequate employer records does not render an employee's word good enough to establish either liability or damages. If the employee's testimony is imprecise and/or representative, there still must be a sufficient evidentiary showing that he was improperly compensated.

And yet, beyond his word, the only evidence that Sohn produced was a series of pictures of Yang's home renovation. On their face, these may prove there were home renovations to Yang's residence, but in context, they are meager support for his testimony about the vast number of chores and services Sohn claims he performed. Ultimately, neither Sohn's testimony nor any proffered evidence credibly establishes Yang's liability for failure to pay minimum wage, unpaid overtime, or Sohn's right to damages.

In concluding this way, the Court is observing that before an employee enjoys the benefit of a reasonable inference to establish damages, the ordinary preponderance-of-the-evidence burden of proof applies to the first *Mt. Clemens* prong, which requires showing that the employee performed work that was improperly compensated. Courts require the employee to produce more than speculative testimony in meeting this burden. In *Rosano*, the Third Circuit affirmed summary judgment for a municipal employer where police officers failed "to set forth *any* evidence of alleged uncompensated time, whether it be actual or estimated." 754 F.3d at 188. The plaintiffs' only such evidence was a spreadsheet containing estimated overtime calculations, which did "not provide any basis for discerning whether the hours worked by each individual [employee] exceeded the necessary threshold for overtime under the FLSA." *Id.* at 188–89. "Absent any evidence to support the officers' estimate of their overtime damages," concluded the court, the "calculations on the spreadsheet become mere speculation, and are insufficient to support the requisite inference to meet [plaintiffs'] burden." *Id.* at 189 (citing *Martin*, 949 F.2d at 1297, for the proposition that an employee must "submit *sufficient evidence* from which violations of the [FLSA] and the amount of an award may be *reasonably inferred*") (emphasis added in *Rosano*).

Here, Sohn has not created an inference sufficient to shift the burden under *Mt. Clemens*. *See id.* at 188 (recognizing that "the burden shifts to the employer" only "[o]nce this inference is created"). Sohn has not proven by a preponderance of the evidence that he performed improperly uncompensated work and his case therefore does not justify the Court drawing a just and reasonable inference in his favor regarding damages. Sohn's representative testimony does not establish defendants' liability because it is neither supported nor corroborated: He has not, for instance, offered "substantial other evidence," or shown systematic falsification of records by

Kominox USA, or shown "a uniform pattern or practice" of overtime pay shortfalls by Kominox USA. *Reich*, 821 F. Supp. at 984. Nor has he provided any documentary evidence or the testimony of either an expert or a supportive lay witness. *Bouaphakeo*, 577 U.S. at 450. Instead, he narrated a life he allegedly lived for four years performing dreary domestic chores, doing menial office tasks, cooking and cleaning up for his employer's family, and assisting in an after-hours relationship his employer was conducting. To support this uncomfortable testimony, he asks this Court to take him at his word, which is not enough.

Sohn did not offer the testimony of people who figure into his narrative, such as his brother or wife, to substantiate his claimed participation in Yang's home renovations or his claim that he barely saw his newborn daughter or slept no more than four hours a night. Furthermore, there was no rebuttal testimony after Yang testified to his starkly different version of the employer/employee relationship.

In a lawsuit where the lack of probative records is a problem, the issue of credibility looms large. Sohn himself damaged his credibility when the Court inquired about exact dates he traveled with Yang:

> THE COURT: And you can't help me and give me any dates for the Cayman Islands, the L.A. trip, and Washington within those three years?
> THE WITNESS: After I was terminated I went through the worse [*sic*] time in my life for two years. I suffered so much mentally as well. I had anxiety attack, a very severe anxiety attack. I was not able to breathe. I was not able to go outside. So I tried my best to forget about this whole thing.

(1T 77:3–10.) This testimony reveals that Sohn did not hold himself to any standard of accuracy in his recital of events. Rather, he told the Court he actively tried to forget them. He further insinuates that Yang's treatment caused psychological damage—an allegation that appeared at trial for the first time. Worse, the testimony throws into high relief the veracity of both the original complaint and the FAC. Sohn filed suit one month after Yang fired him. Both

complaints allege in detail woeful mistreatment by Yang and specific chores and tasks that Sohn performed for Yang's benefit. (*See, e.g.,* FAC ¶¶ 26–34.) Sohn's sworn testimony about memory loss and two years of mental anguish beginning in August 2021 overlaps with the specific allegations of a stunted and exploited existence filed one month later in this lawsuit and pursued throughout this litigation. And so, while Sohn provides no evidence corroborating his testimony, he does expressly discredit himself and give the Court little reason to adopt his rendition of events.

In contrast, Yang was credible. His explanations of what he expected Sohn to do at the office job he created for him and why he created it, the compensation structure, and the extent and nature of Sohn's services to Yang beyond the office were consistent and reasonable. He conceded the lack of contemporaneous timekeeping but nonetheless offered a reasonable estimation of Sohn's hours worked. He established that his payroll process was legitimate and orderly by introducing CPA-produced payroll records and proving that he withheld taxes and provided health insurance benefits. His narrative of hiring Sohn to help with immigration is reasonable, and his stress on providing insurance is consistent with Sohn's testimony. (*See* 1T 23:8–11) ("He said since I was married and I would probably have kids and I would need insurance, and he was explaining to me that he would get me insurance as well if I work under him. And he was explaining to me about the insurance in the U.S.").

The Court agrees with defendants' argument in their post-trial papers that the divergent narratives in this case require deciding if this is "a case of a man with the means to hire people to take care of his and his family's needs, who thought it would be fun to have a personal slave to do his bidding" or if it is "a case of a man who wanted to help a fellow Korean immigrant by giving him a job that didn't need to be filled, paid him for a full 40[-]hour week every week even

though he didn't work a full 40[-]hour week, paid him an extra $800 per month out of his own pocket to help him out [with car and personal expenses], and provided him, his pregnant wife and then[-]newborn child with health and dental insurance." (Def. PFF at 17.) The testimony and evidence at trial make the latter formulation of this relationship more credible.

In a bench trial, resolving differences between competing narratives in the absence of probative evidence remains the Court's "near-exclusive province." *Bouaphakeo*, 577 U.S. at 459. Here, the Court concludes that Sohn has not met his burden of proving by a preponderance of the evidence that Yang owes him money in some amount such that he may be entitled to a just and reasonable inference as to actual damages. Accordingly, the burden does not shift to defendants. The Court finds further that even if the burden did shift, Yang provided sufficient credible testimony to negate the reasonableness of any inference that Sohn raised. Based on its careful examination of the testimony offered by employee and employer, the records produced by the employer, and the framework of the applicable statutes, the Court enters judgment in favor of defendants.

## V. Conclusion

For the foregoing reasons, the Court concludes that Sohn has not shown that Yang improperly compensated him for overtime work or failed to pay him minimum wage during his years of employment with Kominox USA and thus has not met his burden under the federal and state statutes. Final judgment is therefore warranted in defendants' favor and against Sohn on all counts in the amended complaint. An appropriate order will follow.

Dated: October 22, 2026

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.